# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PRESCRIPTION ADVISORY SYSTEMS & TECHNOLOGY, INC.,[1] | Case No. 18-12601 |
| Debtor. | |

## DECLARATION OF RICHARD G. BUNKER, JR. IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND REQUESTS FOR FIRST DAY RELIEF

**I, RICHARD G. BUNKER, JR.,** hereby declare, under penalty of perjury, as follows:

1. I am the Chief Executive Officer ("CEO") of the above-captioned debtor and debtor-in-possession Prescription Advisory Systems & Technology, Inc. ("PAST" or the "Debtor"). I have served as CEO of PAST since, 2014 after I co-founded the company in 2013. I am also a member of the Board of Directors, and equity holder, and a holder of unsecured notes.

2. As CEO, I am responsible for assisting in the management of PAST's operations, overseeing PAST's liquidity management, and assisting with the restructuring process of PAST. In my capacity as CEO of PAST for more than four years, I am familiar with the operations and financial affairs of PAST.

3. I submit this declaration (the "First Day Declaration") in support of the Debtor's chapter 11 petition and requests for relief contained in certain "first day" applications and motions filed on or shortly after the date hereof (the "First Day Motions").[2]

4. On November 13, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The

---

[1] The last four numbers of the Debtor's tax identification number are 2743. The Debtor's corporate address is 312 Summit Avenue, Jenkintown, Pennsylvania 19046.

[2] All capitalized terms used but not otherwise defined herein have the meanings ascribed in the applicable First Day Motion.

1

Debtor continues to operate its businesses and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtor's management and the Debtor's advisors, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6. Part I of this First Day Declaration provides a brief overview of the Debtor and a summary of this chapter 11 case (collectively, the "Chapter 11 Case"). Part II of this First Day Declaration describes in more detail the Debtor's business, corporate structure and history, capital and debt structure, developments which led to the Debtor's chapter 11 filings, and the Debtor's goals during these Cases. Part III sets forth the relevant details of the various First Day Motions.

## I.    INTRODUCTION

7. PAST is an emerging medical technology and software company. PAST improves prescribers' and dispensers' regulatory compliance and quality of care by integrating the mandated check of the state prescription drug monitoring program (the "PDMP") into the electronic health record ("EHR") and pharmacy management systems used by health professionals. This saves users at least two minutes per encounter, satisfies their regulatory obligation, provides a better understanding of every patient's controlled substance prescription history, and improves patient care. PAST provides a digital health SaaS used by nearly 2,000 health professionals across the United States.

8. Despite PAST's progress in developing, implementing, and deploying its services to health care professionals and providers, it has struggled for nearly its entire existence to attract the capital necessary for sustainable expansion and growth of its business. PAST has continually sought seed-money investment into the business, almost all of which was done by investors on an unsecured basis. The management of PAST continues to concentrate on expanding business growth opportunities. In particular, PAST is currently in discussions with certain health care providers to secure long-term contractual commitments for its services. PAST anticipates that these potential contractual commitments will materialize into sustainable revenue-generating opportunities, which when obtained will clear the path for PAST to be a successful and profitable business going for the foreseeable future.

9. Notwithstanding the real potential for a successful business, over the last few months, PAST has been in discussions with its stakeholders, including the various noteholders, to negotiate restructuring alternatives and a "clean-up" of the balance sheet. PAST proposed a restructuring of its liabilities whereby the unsecured noteholders would convert their debt to equity in PAST. PAST received substantial support for this proposal from the noteholders, but unfortunately was unable to gain unanimous support. In particular, three (3) noteholders (the "Dissident Noteholders") have refused to join in this restructuring proposal and have threatened litigation against PAST.

10. Faced with past and impending maturity dates on some of the notes, and the threat of litigation by the Dissident Noteholders, PAST had no other choice but to commence the Chapter 11 Case with the goal to effectuate the restructuring proposed over the last few months. With the expected increase in business and revenue, PAST expects to come out of bankruptcy in short order with a cleaner balance sheet and profitable business.

## II. BACKGROUND

**A.     Business Operations**

11.     As stated, PAST is a provider of services that improves prescribers' and dispensers' regulatory compliance and quality of care by integrating the mandated check of the state PDMP into the EHR and pharmacy management systems used by health professionals.  PAST's primary customers include hospital systems and physician practices and pharmacies.

12.     PAST maintains a website at http://www.pastrx.com.

13.     PAST is headquartered in Jenkintown, Pennsylvania, and presently operates primarily in Pennsylvania.

14.     PAST has 6 employees, with 3 full-time salaried employee and 3 full-time employees receiving commission and benefits.  PAST revenues have hit their highest level as of October 31, 2018 with recurring gross revenue of approximately $545,000 up from approximately $34,000 in 2016 and $352,000 in 2017.  PAST anticipates that its revenues will be significantly higher in 2018, and its expects to approach break-even profitability by first quarter 2019.

**B.     Corporate Structure**

15.     PAST is a privately-held Delaware corporation formed in 2013

16.     PAST's Board of Directors (the "Board") consists of three (3) directors, of which I am one of the members of the Board.

**C.     Capital and Debt Structure**

17.     As an emerging company, since inception PAST has relied on continued cash infusions from investors as it has grown its business.  PAST historically has not been, and is not

today, able to finance itself solely from its operational cash flows.  Set forth below is a description of PAST's capital and funded debt structure as of the date hereof.

### *Secured Debt*

18. Prior to the Petition Date, in order to fund the prepetition retainer for PAST to engage bankruptcy counsel, Will Bast (the "DIP Lender") provided an advance on the DIP Facility in the amount of $20,000.00 in the form of a prepetition secured promissory note (the "Secured Prepetition Promissory Note").  The funding provided under the Secured Prepetition Promissory Note enabled PAST to continue preparation for this bankruptcy petition.  Pursuant to the Secured Prepetition Promissory Note, the total prepetition funding provided by the DIP Lender of $20,000.00 is secured by a first priority and duly perfected lien on substantially all of the Debtor's assets.

### *Unsecured Debt – Senior Notes*

19. PAST is indebted to numerous unsecured noteholders for promissory notes (the "Unsecured Notes") as set forth below:

| Investor | Principal | Issued | Matures | Total Due at Maturity |
|---|---|---|---|---|
| Chuck Hadley | $29,000 | 6/26/18 | 12/31/18 | $59,208 |
| Steve Cloetingh | $29,000 | 6/26/18 | 12/31/18 | $59,208 |
| Eric Corkhill | $6,000 | 6/26/18 | 12/31/18 | $12,250 |
| Rick Bunker | $1,000 | 6/26/18 | 12/31/18 | $2,042 |
| Will Bast | $20,000 | 6/26/18 | 12/31/18 | $40,833 |
| Matthew Reichert | $29,000 | 6/26/18 | 12/31/18 | $59,208 |
| Daniel Endy | $20,000 | 6/26/18 | 12/31/18 | $40,833 |
| **Sub Tot - Senior Notes** | **$134,000** | | | **$273,583** |
| Joseph B. Studholme | $150,000 | 1/29/15 | 1/29/18 | $163,512 |
| R. Ross Holloway | $30,000 | 10/13/13 | 10/14/18 | $32,493 |
| Leigh Gibson | $50,000 | 3/2/14 | 3/3/19 | $54,605 |
| Ben Franklin Tech. Prtns. | $150,000 | 3/1/15 | 3/31/20 | $211,052 |
| Ben Franklin Tech. Prtns. | $135,000 | 5/14/15 | 3/31/20 | $187,757 |
| Ben Franklin Tech. Prtns. | $15,000 | 10/16/15 | 3/31/20 | $20,352 |
| Ben Franklin Tech. Prtns. | $100,000 | 3/15/16 | 3/31/21 | $140,373 |
| Ben Franklin Tech. Prtns. | $83,250 | 3/31/16 | 3/31/21 | $116,568 |
| Ben Franklin Tech. Prtns. | $16,750 | 5/1/16 | 3/31/21 | $23,340 |
| Ben Franklin Tech. Prtns. | $75,000 | 7/20/17 | 3/31/22 | $103,192 |
| Ben Franklin Tech. Prtns. | $75,000 | 8/1/17 | 3/31/22 | $102,995 |

| | | | | |
|---|---|---|---|---|
| **Sub Tot - Notes** | **$880,000** | | | **$1,156,239** |
| Ryan Clark | $25,000 | 2/23/18 | 2/23/20 | $31,500 |
| David Donald | $50,000 | 2/23/18 | 2/23/20 | $63,000 |
| Chuck Hadley | $25,000 | 2/23/18 | 2/23/20 | $31,500 |
| Will Bast | $25,000 | 2/23/18 | 2/23/20 | $31,500 |
| Steve Cloetingh | $10,000 | 7/12/18 | 7/12/19 | $11,800 |
| Will Bast | $10,000 | 7/12/18 | 7/12/19 | $11,800 |
| Matthew Reichert | $25,000 | 2/23/18 | 2/23/20 | $31,500 |
| Steve Cloetingh | $100,000 | 5/10/18 | 5/10/20 | $126,022 |
| **Sub Tot - Unsecured Notes** | **$270,000** | | | **$338,622** |
| Chuck Hadley | $25,000 | 12/16/16 | 12/15/21 | $35,000 |
| Chuck Hadley | $20,000 | 10/16/17 | 10/15/22 | $28,000 |
| Daniel Endy | $40,000 | 11/16/17 | 11/15/22 | $56,000 |
| David Stengle | $70,000 | 10/16/17 | 10/15/22 | $98,000 |
| Eric Corkhill | $25,000 | 3/16/17 | 3/15/22 | $35,000 |
| Eric Corkhill | $25,000 | 4/16/17 | 4/15/22 | $35,000 |
| Eric Corkhill | $15,000 | 2/24/15 | 2/23/20 | $21,000 |
| Larry Dillon | $35,000 | 2/24/15 | 2/23/20 | $49,000 |
| Matthew Reichert | $15,000 | 2/24/16 | 2/23/21 | $21,000 |
| Matthew Reichert | $15,000 | 2/24/16 | 2/23/21 | $21,000 |
| Rick Bunker | $100,000 | 2/24/16 | 2/23/21 | $140,000 |
| Steve Cloetingh | $100,000 | 2/24/16 | 2/23/21 | $140,000 |
| Steve Cloetingh | $50,000 | 2/24/16 | 2/23/21 | $70,000 |
| Vince Mendola | $12,500 | 2/24/15 | 2/23/20 | $17,500 |
| Vince Mendola | $2,500 | 2/24/15 | 2/23/20 | $3,500 |
| Will Bast | $50,000 | 2/24/16 | 2/23/21 | $70,000 |
| **Sub Total - Conv Notes** | **$600,000** | | | **$840,000** |
| **Total Debt** | **$1,884,000** | | | **$2,608,444** |

20. The Unsecured Notes issued by PAST have varying maturity dates and priority levels as set forth above.

### *Unsecured Debt – Factoring Agreement*

21. In June 2018, PAST entered the *ACH Total Receipts Agreement for Purchase and Sale of Interest in Total Receipts* (the "Factoring Agreement") with MCA Fixed Payment LLC d/b/a Reliant Funding ("Reliant"). Reliant provided funding of $48,500.00 to PAST in exchange for an interest in PAST's collection of certain receivables. The current amount to Reliant under the Factoring Agreement is $18,200, and PAST is current in its payments to Reliant. PAST believes that the Factoring Agreement is unsecured.

### *Unsecured Debt – Trade and Miscellaneous Debt*

22. As of the Petition Date, PAST owed approximately $170,000.00 in trade debt and $454,376 unsecured notes payable to executives for compensation not paid (2015-10/31/18) and another approximately $50,000 in unpaid advances from executives for business expenses paid by the executives on behalf of the company.

### *Equity Interest*

23. PAST has issued and outstanding both common stock and preferred stock Series A. There are 1,800,000 shares of common stock currently outstanding with Stuart Leeds, Richard Bunker and Adrienne Redd being the largest holders of common stock. The preferred stock has preferred rights with respect to liquidation and other corporate actions. There are 3,780,423 shares of preferred stock currently outstanding with Richard Bunker and Adrienne Redd being the largest holders of preferred stock. In addition, certain of the noteholders have convertible features in their Unsecured Notes that allow for conversion of the debt into equity. PAST has no publicly traded stock.

**E.     Debtor's Goals in These Chapter 11 Cases**

24. PAST intends to use this Case to pursue and complete the restructuring of the company that was contemplated prior to the Petition Date. In particular, PAST will soon propose a plan of reorganization, with the expected approval of its unsecured creditor body, including noteholders, which will propose a debt for equity swap of the Unsecured Notes and payment to all other unsecured creditors. With the expected increase in revenues, and the cleaner balance sheet once this reorganization is approved and completed, the management of PAST expects that it will emerge from bankruptcy as a successful and profitable business.

### III.     FIRST DAY MOTIONS

**A.     Motion of the Debtors for Entry of an Interim Order and Final Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms**

**and Checks, (B) Authorizing the Continued Use of Existing Cash Management Systems, and (C) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(B) (the "Cash Management Motion")**

25. By the Cash Management Motion, the Debtor seeks entry of interim and final orders (i) authorizing the maintenance of its Bank Accounts and continued use of existing Business Forms; (ii) authorizing but not directing the continued use of their existing Cash Management System; and (iii) providing any additional relief required in order to effectuate the foregoing. The Debtor also requests the right, in their discretion, to (i) pay any Bank Account related fees; and (ii) close or otherwise modify the terms of certain of the Bank Accounts and open new debtor-in-possession accounts as may be necessary to facilitate the Chapter 11 Case and their operations, or as may otherwise be necessary to comply with the requirements of any debtor-in-possession financing and/or cash collateral order entered in the Chapter 11 Case.

26. Further, the Debtor requests that the Court waive the requirements of Bankruptcy Code section 345(b) on an interim basis and permit the Debtor to maintain their deposits in the Bank Accounts in accordance with existing deposit practices until such time as the Debtor obtain this Court's approval to deviate from the guidelines imposed under Bankruptcy Code section 345(b) on a final basis. The Debtor's existing deposit practices are significantly less burdensome and more appropriately tailored to their business needs than the practices otherwise required under the Bankruptcy Code and by the U.S. Trustee Guidelines.

27. The continued use of the Cash Management System and the Bank Accounts during the pendency of these Cases is essential to the Debtor's business operations. The Debtor believes that the Bank Accounts and related Cash Management System mechanisms are well-suited to the Debtor's business needs and operations. To require the Debtor to close the Bank Accounts and reestablish new accounts would not result in greater administrative controls and would require

considerable time and expense to the Debtor's estates. Moreover, permitting the Debtor to continue using their existing Bank Accounts is essential to a smooth and orderly transition of the Debtor into chapter 11 and to avoid disruption of their businesses and operations, including the disruption that could result if checks written but not negotiated or cashed prior to the Petition Date were dishonored.

28. The Cash Management System is a practical mechanism that allows the Debtor to transfer their revenues to the payment of their obligations that decreases the burdens on the Debtor, and that provides several important benefits, including the ability to: (i) control and monitor corporate funds; (ii) ensure cash availability; (iii) accept certain foreign currencies; and (iv) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. Moreover, continued operation of the Cash Management System is crucial to the Debtor's ongoing business operations.

29. Without the relief requested, I believe the Debtor would be unable to effectively and efficiently maintain their financial operations. Such a result would cause significant harm to the Debtor's businesses and the value of their estates. Accordingly, I believe that the relief requested is in the best interest of the Debtor, their estates and creditors, and all parties in interest.

**B.     Motion of the Debtor for Entry of an Interim Order and Final Order Authorizing the Debtor to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations (the "Employee Wages and Benefits Motion")**

30. By the Employee Wages and Benefits Motion, the Debtor seeks entry of entry of interim and final orders (i) authorizing, but not directing, the Debtor to (a) pay and/or perform, as applicable, prepetition obligations to current employees including accrued prepetition wages, salaries, and other cash and non-cash compensation claims (collectively, the "Employee Wage Obligations"); (b) maintain and continue to honor their practices, programs, and policies for their

employees that were in effect as of the Petition Date, as such may be modified, amended or supplemented from time to time in the ordinary course, including without limitation, the continuation and maintenance of the Debtor's various employee benefit plans and programs (and to pay all fees and costs in connection therewith, including those that arose prepetition) (collectively, the "Employee Benefit Obligations"); (c) reimburse Employees for prepetition expenses incurred on behalf of the Debtor in the ordinary course of business (the "Employee Expense Obligations"); (d) continue to pay and/or contest in good faith all amounts related to workers' compensation claims that arose prepetition (the "Workers' Compensation Obligations"); (e) pay all related prepetition withholdings and payroll-related taxes and deductions (the "Employer Taxes and Deductions" and collectively with the Employee Wage Obligations, Employee Benefit Obligations, Employee Expense Obligations and Workers' Compensation Obligations, the "Employee Obligations") associated with the Employee Wage Obligations and Employee Benefit Obligations; and (ii) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment request for payment of any prepetition Employee Obligations.

31. As of the Petition Date, PAST has 6 employees, with 3 full-time salaried employees and 3 full-time employees receiving commission and benefits (the "Employees").

32. The Debtor's Employees perform a variety of critical functions, including developing and selling the Debtor's products and services, running their business and technical operations, supporting customers, performing general and administrative services, providing financial services, and other related tasks. The Employees' skills, knowledge, and understanding of the Debtor's operations and business relations are essential to the effective operation of the Debtor's business.

33. In the ordinary course of business, the Debtor incurs payroll obligations for salaries, commissions and hourly wages owed to their Employees. Salaries and hourly wages for the Employees are paid twice a month. The average total monthly payroll obligations are approximately $43,000.00 for the Employees. As of the Petition Date, the Debtor estimates that it owes $26,745.79 to its Employees for prepetition Employee Wage Obligations (collectively, the "Prepetition Wage Obligations"). The Debtor seeks the authority to pay and honor Prepetition Wage Obligations in an amount not to exceed $30,000.00 in the aggregate for Employees, and to continue to honor the Employee Wage Obligations on a postpetition basis in the ordinary course of business.

34. The Employees are essential to the continued operation of the Debtor's business, and the Employees' morale directly affects their effectiveness and productivity. Consequently, it is critical that the Debtor continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date. A loss of employee morale and goodwill at this critical juncture would undermine the Debtor's stability, and undoubtedly would have an adverse effect on the Debtor, their customers, the value of their assets and businesses, and their ability to achieve their objectives in chapter 11.

35. I believe that payment of all Prepetition Employee Obligations in accordance with the Debtor's prepetition business practices will enable the Debtor to retain their qualified and highly-skilled employees and is in the best interests of the Debtor, their estates and creditors, and all parties in interest.

**D.  Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Post-Petition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Superpriority Claims, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "DIP Financing Motion")**

36. By the DIP Motion, the Debtor respectfully requests that the Court enter interim and final orders (i) authorizing the Debtor to enter into senior secured and superpriority post-petition financing (the "<u>DIP Facility</u>") with Will Bast as lender under the DIP Facility (in such capacity, the "<u>DIP Lender</u>") (ii) authorizing the Debtor to use Cash Collateral; (iv) granting liens and superpriority administrative claims to the DIP Lender pursuant to section 364 of the Bankruptcy Code; and (iv) granting related relief. Specifically, by the DIP Motion, the Debtor request interim and final authorization for it to obtain the DIP Facility, which if approved on a final basis would consist of post-petition financing in a total amount of $120,000, inclusive of the Roll-Up Loan in an amount equal to $20,000, subject to the terms and conditions of the DIP Facility.

37. Unsecured financing is not available to the Debtor. The Debtor exhausted its avenues to obtain any additional unsecured financing. The Debtor spoke to a number of outside parties about lending either on an unsecured basis, or through a traditional DIP facility, but none of those third parties ultimately expressed interest in doing so. Additionally, the Debtor explored potential financing from its existing unsecured creditor body. The DIP Lender, who is a current noteholder, was the only party that expressed interest in providing additional financing, but only would do so if such financing was on a secured basis. The DIP Lender also expressed interest in providing the financing in the form of a debtor-in-possession financing in the context of a chapter 11 case, which ultimately lead to the terms of the DIP Facility.

38. As discussed in detail above, this Chapter 11 Case follows several exhaustive yet unavailing efforts by the Debtor to attract capital and consummate strategic transactions over the past year. Faced with the depletion of remaining liquidity and the inability to obtain further funding outside of chapter 11, the Debtor's management took the steps they deemed necessary and

exercised their best business judgment in negotiating the DIP Facility. The Debtor's management and the Board ultimately concluded that the DIP Facility will provide immediate access to capital to pay their limited ongoing operating expenses while enabling the Debtor to the contemplated reorganization.

39. Without this financing (and the funding provided prepetition under the Secured Prepetition Promissory Note) the Debtor would most likely have liquidated under chapter 7 with no chance for a recovery to their creditors. The DIP Facility is the Debtor's best and only means of obtaining the liquidity necessary to avoid a shutdown of their business, preserve going concern value, and effectuate this reorganization.

40. The proceeds of the DIP Facility are sized to preserve and promote the viability of the Debtor's assets and support the Debtor through the anticipated pendency of this chapter 11 cases, but nothing more. Moreover, the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.

41. Based on the Debtor's negotiations regarding the DIP Facility, the terms of the DIP Loan Documents constitute, on the whole, the most favorable terms the Debtor could achieve upon which the DIP Lender will extend the necessary postpetition financing. Although the Debtor explored whether the DIP Lender would provide the DIP Facility without certain provisions, in the course of negotiations, the DIP Lender indicated it would not be willing to provide the DIP Facility without such terms. In particular, the DIP Lender would not provide financing without the provisions requiring, in particular, (i) the achievement of certain case milestones, including the filing of a chapter 11 plan and a date certain for confirmation of said plan; (ii) the conversion of the Senior Prepetition Promissory Note into a Roll-Up Loan under the DIP Facility; and (iii) securing the DIP Facility with first-priority liens and superpriority claims. These are key

components of consideration for the DIP Lender without which it has indicated it is unwilling to provide the DIP Facility.

42. Accordingly, the Debtor, in consultation with its advisors – recognizing the absence of any competing financing proposals and the benefits to be provided under the DIP Facility – determined that the terms of the DIP Facility were superior to any other set of terms reasonably available to the Debtor at this time, and in fact the only available terms. Therefore, the DIP Facility provides the Debtor with the best, most feasible, and value-maximizing financing option available at this time.

43. Moreover, the Debtors have concluded that the economic terms of the DIP Facility are fair and reasonable and are consistent with what can be expected in a debtor-in-possession financing facility. In that regard, it is worth noting that the DIP Lender has not imposed any fees on the Debtor for providing the DIP Facility. After thorough analysis by the Debtor and their advisors, they have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances. The non-economic terms of the DIP Facility, including the case milestones, are also within the range of what can be expected for a debtor-in-possession financing facility, particularly considering the facts and circumstances of this Case, the nature of the Debtor's assets, and the extensive marketing and sale process that preceded this Case.

44. For these reasons, in the Debtor's prudent business judgment, the terms of the DIP Facility are fair and reasonable in the circumstances of the Case and the Debtor could not obtain postpetition financing from any other lending source. Accordingly, I believe that the relief requested in the DIP Motion is in the best interests of the Debtor, their estates and creditors, and all parties in interest.

.

## IV. CONCLUSION

45. For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions and respectfully request the Court to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 13, 2018

/s/ *Richard G. Bunker, Jr.*
Richard G. Bunker, Jr.
Chief Executive Officer